COUNTY OF WAKE, Petitioner v. NORTH CAROLINA DEPARTMENT OF ENVIRON-
MENT & NATURAL RESOURCES, and JERRY FRANKS and JOHN SCHIFANO, et
al., Respondents and TOWN OF HOLLY SPRINGS, Respondent-Intervenor

No. COA01-847

(Filed 31 December 2002)

### 1. Administrative Law—final agency decision—de novo review

The trial court properly exercised a de novo review in examining the substantive issues raised by respondent individuals' appeal concerning the reversal of a final administrative agency decision that ordered the withdrawal of a permit to construct a municipal solid waste landfill that had been issued to petitioner county.

### 2. Administrative Law—North Carolina Administrative Procedures Act—standing—persons aggrieved

Individual respondents who were adjacent property owners to a proposed landfill and respondent-intervenor town qualify as "persons aggrieved" under the North Carolina Administrative Procedures Acts and issues raised by respondents on appeal including the issue of whether respondent-intervenor town approved the location of the proposed landfill facility within its jurisdiction were properly before the trial court.

### 3. Public Health—solid waste management regulations—new and separate facility—lateral expansion

The trial court did not err by concluding that respondent-intervenor town's initial approval contained in its 1 September 1992 resolution included the construction of a new and separate sanitary landfill facility and was not only for a lateral expansion of the existing landfill.

### 4. Estoppel—equitable—municipal corporation—ratification

The trial court did not err by concluding that respondent-intervenor town could not withdraw its approval for petitioner county's landfill facility on 19 May 1998 even though respondent individuals contend the town at all times possessed the inherent power to withdraw its approval pursuant to its discretionary governmental authority because the town's multiple acts of ratification of its prior approval equitably estopped the town from withdrawing its approval.

**5. Franchise—solid waste management regulations—sanitary landfill**

The trial court did not err by concluding that petitioner county was not required to obtain a franchise under N.C.G.S. § 130A-294(b1)(3) or N.C.G.S. § 160A-319 from respondent-intervenor town for operation of a sanitary landfill prior to receiving Facility Permit 92-22.

**6. Public Health—solid waste management regulations—sanitary landfill—applicability of administrative rule**

The trial court did not err by concluding that 15A N.C.A.C. 13B.1618 did not apply to petitioner county's permit to construct a sanitary landfill.

**7. Public Health—solid waste management regulations—sanitary landfill—applicability of statute**

The trial court did not err by concluding that N.C.G.S. § 153A-136(c) was inapplicable to petitioner county's selection of the site for a proposed new sanitary landfill.

Judge WALKER concurring.

Appeal by respondents and respondent-intervenor from order entered 19 March 2001 by Judge Donald W. Stephens in Wake County Superior Court. Heard in the Court of Appeals 17 April 2002.

*Wake County Attorney's Office, by Michael R. Ferrell, for petitioner-appellee County of Wake.*

*Land Loss Prevention Project, by Katherine Carpenter and Marcus Jimison; John Schifano; and John D. Runkle, for respondent-appellants Jerry Franks and John Schifano, et al.*

*The Sanford Holshouser Law Firm, by Anna K. Baird and Ernest C. Pearson, for respondent-intervenor-appellant Town of Holly Springs.*

*Attorney General Roy Cooper, by Assistant Attorneys General Nancy E. Scott and Lauren M. Clemmons, for North Carolina Department of Environment and Natural Resources, amicus curiae.*

*James B. Blackburn, General Counsel; and Jordan Price Wall Gray Jones & Carlton, by R. Frank Gray and Hope Derby Carmichael, for North Carolina Association of County Commissioners, amicus curiae.*

COUNTY OF WAKE v. N.C. DEP'T OF ENV'T & NATURAL RES.

[155 N.C. App. 225 (2002)]

CAMPBELL, Judge.

Jerry Franks, John Schifano, *et al.*, and the Town of Holly Springs (collectively, "respondents"), appeal the superior court's reversal of a judicially-imposed final agency decision of the North Carolina Department of Environment and Natural Resources ("DENR").[1] The judicially-imposed final agency decision had ordered the withdrawal of a permit to construct a municipal solid waste landfill ("Facility Permit 92-22") that had been issued to Wake County.

This appeal deals with numerous issues involving the interpretation and application of North Carolina statutory and regulatory law pertaining to solid waste management. This body of law impacts decisions on where solid waste landfills are to be located in this State and the relationships between counties and municipalities in making and implementing such decisions.

In 1990, Wake County began pursuing plans to expand its South Wake Sanitary Landfill, commonly referred to as the Feltonsville Landfill, in order to provide additional space for the disposal and storage of solid waste. The Feltonsville Landfill is located just outside the Town of Holly Springs ("Town").

In October 1990, the Wake County Board of Commissioners ("County Board") authorized the purchase of a 162.37-acre tract of land adjacent to the Feltonsville Landfill. In July 1991, an engineering consulting firm hired by Wake County informed the County Board that the 162.37-acre tract was insufficient to handle the long-term solid waste disposal needs of the County and recommended that several tracts near the 162.37-acre tract also be purchased for additional landfill space. On 5 August 1991, the County Board directed County staff to pursue the acquisition of additional property adjacent to the initial 162.37-acre expansion area for the Feltonsville Landfill. The County Board subsequently approved the purchase of four additional tracts of land, totaling approximately 311 acres, all located within the zoning jurisdiction of the Town.

In December 1991, Wake County officials met with the Town of Holly Springs Board of Commissioners ("Town Board") to explain the County's plans for expansion of the Feltonsville Landfill. County offi-

---

1. DENR did not file a brief as a party to this appeal due to the unique procedural posture created by the administrative law judge's recommended decision being adopted as the final agency decision by court order pursuant to N.C. Gen. Stat. § 150B-44. However, DENR did file an *amicus* brief in support of the superior court's reversal of the administrative law judge's judicially-imposed decision.

cials delivered a detailed explanation of the landfill expansion plans, provided maps showing the size and scope of the project, and made themselves available for questions from the Town Board. The minutes of the Town Board meeting recite that the expansion is to "include a total of 482 acres, 400 of which [are] to be located within Holly Springs." The minutes of the meeting indicate no objections from the Town Board to the landfill expansion plans as presented.

On 1 September 1992, County officials attended a second Town Board meeting and again provided a detailed explanation of the landfill expansion plans. The Town Board was informed that the project would cover approximately 471 acres, with approximately 189 acres used for municipal solid waste disposal, with the remaining acreage used for buffers, sedimentation basins, access roads, borrow areas, construction waste disposal, and ancillary facilities. At the meeting, the Town Board voted to approve a resolution granting "prior approval for the issuance of a sanitary landfill permit by the Division of Solid Waste Management to Wake County, said landfill to be established on approximately 380 acres shown on the attached map, part of which acreage is located within the extra-territorial zoning jurisdiction of the Town of Holly Springs, North Carolina." Approximately 320 acres of the proposed landfill was to be located within the Town's zoning jurisdiction.

On 4 December 1992, Wake County submitted a site plan application for the proposed landfill facility to DENR pursuant to the applicable solid waste management regulations. The cover letter accompanying the site plan application referred to its contents as an application for site approval for "the new South Wake Solid Waste Management Facility." The submission of the site plan application was accompanied by the required local government approval from the Town Board, but was not accompanied by the required approval from the County Board. The County Board's approval was subsequently submitted to DENR's Division of Solid Waste Management, Solid Waste Section.

In 1993, after Wake County had submitted its site plan application, the law governing the construction of municipal solid waste landfills changed to address the groundwater contamination problem caused by "leachate seepage." "Leachate" is "liquid that has passed through or emerged from solid waste and contains soluble, suspended, or miscible materials removed from such waste." 15A NCAC 13B.1602(15) (2002). The new law and implementing regulations required that all landfills be lined; that is, have a system to capture

and collect leachate for treatment at a local wastewater treatment plant. In addition, all existing unlined landfills, such as the Feltonsville Landfill, were required to cease operations by 1 January 1998. As a result, the County's proposed landfill facility could no longer accurately be referred to as an "expansion" of the Feltonsville Landfill. Thereafter, the proposed facility began to properly be referred to as a "new" landfill. However, neither the size, location, anticipated years of operation, location of roads, location of buffer areas, nor any other factor related to the operation of the proposed facility changed in any material respect from the plans presented to and approved by the Town Board on 1 September 1992 and subsequently submitted in the County's site plan application. The only thing that changed was the law, which now mandated that the County's proposed facility be considered a "new" landfill instead of an "expansion" of the existing Feltonsville Landfill, which was now set for closure in 1998.

On 15 December 1994, the County and the Town entered into an Interlocal Agreement under which the Town agreed to provide the County 50,000 gallons per day of wastewater treatment capacity in the Town's wastewater treatment plant for the treatment of leachate generated by the new landfill. In return, the County agreed to forgive $298,291.00 in debt owed by the Town and pay $228,800.00 to the Town for construction of a wastewater collection system and pumping station to service the landfill site. The Interlocal Agreement reiterated the Town's approval of the construction and operation of the proposed landfill facility within the Town's zoning jurisdiction.

On 14 March 1995, DENR approved the County's site plan application and authorized the County to prepare an application for a permit to construct the proposed landfill. The County then authorized its engineering consultants to prepare the documents required to obtain the permit to construct. Those documents were filed with DENR on 31 December 1996.

In the interim, on 17 April 1995, the Town and the County amended their Interlocal Agreement to require the County to forthwith pay the $228,800.00 to the Town for construction of the wastewater collection system and pumping station instead of waiting for approval of its permit to construct. The County paid the Town accordingly.

On 20 May 1997, the Town Board adopted Resolution 97-23, approving the Wake County Ten Year Comprehensive Solid Waste

Management Plan ("Plan"). The Plan stated that all municipal solid waste generated in Wake County between the years 2003 and 2023 would be disposed of and stored at the proposed new facility partially located in the Town of Holly Springs.

On 19 May 1998, the Town Board passed a resolution revoking its prior approval of the issuance of a sanitary landfill permit for the County's proposed landfill facility. The reasons given for the Town Board's decision to revoke its approval included the following: (1) the Town had only approved an "expansion" of the Feltonsville Landfill, not a "new" landfill facility; (2) conditions within the Town had changed dramatically since the Town Board's grant of approval and the proposed landfill site was now unsuitable; and (3) numerous procedural requirements related to the permitting of the landfill had not been followed by the County.

On 18 February 1999, DENR issued Facility Permit 92-22, allowing the County to begin construction of the landfill facility. This permit, which is the focus of this case, grants specific approval for the actual construction of Phase I of the municipal solid waste disposal area ("MSW Phase I"), which is to be constructed in five phases. MSW Phase I covers approximately 47 acres plus infrastructure such as a sediment pond and access roads. MSW Phase I will be permitted to accept household, industrial, and commercial solid waste, and has a projected life of approximately four years. Facility Permit 92-22 also grants general approval of the overall facility concept and layout. However, no other phase of the landfill may be constructed without additional approval from DENR. To construct any phase beyond MSW Phase I, Wake County must receive an amendment to Facility Permit 92-22.

On 19 March 1999, respondent Jerry Franks filed a petition for a contested case hearing with the Office of Administrative Hearings ("OAH"), alleging DENR had issued Facility Permit 92-22 (1) without approval from the Town and County as required under 15A NCAC 13B.1618(c)(5)(A); (2) without the Town and County holding the required public meetings under 15A NCAC 13B.1618(c)(5)(A)(i); (3) based on inaccurate and incomplete application data; (4) in violation of N.C. Gen. Stat. § 130A-294(b1)(2); and (5) in violation of N.C. Gen. Stat. § 153A-136(c).

On 23 March 1999, John Schifano, *et al.* also filed a contested case petition with OAH, alleging DENR had issued the permit (1) in

violation of N.C. Gen. Stat. §§ 160A-325 and 153A-292; and (2) without the Town's required approval.

DENR and Wake County were both named as respondents in the petition filed by Franks. However, Wake County was not named as a respondent in the petition filed by Schifano *et al.* Wake County was allowed to intervene in the Schifano, *et al.* contested case and the OAH consolidated the contested cases for hearing. Thereafter, all parties moved for summary disposition.

On 28 September 1999, the administrative law judge ("ALJ") issued a recommended decision granting summary judgment in favor of respondents Franks and Schifano *et al.* and ordering withdrawal of Facility Permit 92-22 until all applicable procedural requirements were met. The ALJ concluded: (1) respondents Franks and Schifano, *et al.* were "persons aggrieved" under the North Carolina Administrative Procedure Act ("NCAPA") with standing to bring a contested case petition challenging DENR's issuance of Facility Permit 92-22; (2) respondents Franks and Schifano, *et al.* also had taxpayer standing; (3) the Town's 1 September 1992 resolution only granted approval for a "lateral expansion" to the Feltonsville Landfill and not a "new" landfill facility; (4) the Town's approval on 1 September 1992, however classified, was properly and legally withdrawn prior to DENR's issuance of the permit; (5) the County failed to obtain a franchise for operation of a solid waste landfill pursuant to N.C. Gen. Stat. § 160A-319; (6) issuance of the permit violated 15A NCAC 13B.1618; (7) issuance of the permit violated N.C. Gen. Stat. § 130A-294; and (8) issuance of the permit violated N.C. Gen. Stat. § 153A-136(c).

On 3 November 1999, the sealed record in this matter was transmitted from OAH to DENR for a final agency decision. DENR had 90 days from that date to render its final agency decision under N.C. Gen. Stat. § 150B-44.[2] On 1 February 2000, a few days before the final agency decision was due, DENR unilaterally declared "good cause" shown for an extension of time to render its final agency decision up to and including 2 March 2000. On 1 March 2000, DENR again unilaterally declared "good cause" for an extension of time up to and including 31 March 2000. On 30 March 2000, DENR for a third time extended the time for rendering its final agency decision up to and including 7 April 2000.

---

2. N.C.G.S. § 150B-44 has since been amended to provide that a final agency decision is due 60 days after the record is transmitted from OAH to the agency. N.C. Gen. Stat. § 150B-44 (2001).

On 6 April 2000, the individual respondents filed a petition for judicial intervention alleging DENR had violated N.C. Gen. Stat. § 150B-44 by taking multiple extensions of time in which to render its final agency decision. On 7 April 2000, DENR issued a final agency decision modifying the ALJ's recommended decision, withdrawing Facility Permit 92-22, and remanding the matter to the Division of Waste Management, Solid Waste Section, to await Wake County's compliance with N.C. Gen. Stat. § 153A-136(c). However, on 4 October 2000, the individual respondents' petition for judicial intervention was granted and the superior court ordered that the recommended decision of the ALJ be treated as DENR's final agency decision. *See Holland Group v. N.C. Dept. of Administration*, 130 N.C. App. 721, 504 S.E.2d 300 (1998) (holding an administrative agency is only entitled to one extension of time in which to render its final decision under N.C.G.S. § 150B-44).

On 11 October 2000, Wake County filed a petition for judicial review of the final agency decision pursuant to N.C. Gen. Stat. § 150B-45. Wake County asserted the final agency decision was "1) in excess of the statutory authority or jurisdiction of the Agency, 2) made upon unlawful procedure, 3) affected by error of law, 4) unsupported by substantial evidence in view of the entire record and/or 5) arbitrary and capricious."

On 28 November 2000, the parties entered into a consent order allowing the Town of Holly Springs to intervene in the matter.

On 19 March 2001, the superior court entered an order reversing the final agency decision and ordering Facility Permit 92-22 be reissued. The superior court concluded: (1) respondents Franks and Schifano, *et al.* lacked standing under the NCAPA to raise the issue of whether the Town approved the location of the proposed landfill; (2) by its 1 September 1992 resolution, the Town approved the location of a "new" landfill within its jurisdiction as required by N.C.G.S. § 130A-294 and 15A NCAC 13B.0504(1)(e) as they existed at the time; (3) once DENR issued site plan approval to Wake County on 14 March 1995, the Town was prevented from "withdraw[ing] [its] approval absent a showing that the approval was obtained by fraud or material misrepresentation, or that construction plan documents subsequently filed demonstrate[d] that the facility being submitted for a permit [was] substantially different from that which was presented to the [Town] for its approval[;]" (4) the Interlocal Agreement between the County and Town was an enforceable contract by which the Town released its right to withdraw approval for the proposed landfill;

(5) Wake County was not required to obtain a franchise from the Town under N.C.G.S. § 160A-319; (6) the provisions of 15A NCAC 13B.1618 did not apply to Wake County's application; (7) N.C.G.S. § 130A-294(b1)(1)-(3) did not apply to Wake County's application; and (8) N.C.G.S. § 153A-136(c) did not apply to Wake County's application. Respondents Franks, Schifano *et al.*, and the Town of Holly Springs appeal to this Court.

**[1]** Under the NCAPA, a final administrative agency decision may be reversed or modified by the superior court if the agency's findings, inferences, conclusions or decisions are:

(1) In violation of constitutional provisions;

(2) In excess of the statutory authority or jurisdiction of the agency;

(3) Made upon unlawful procedure;

(4) Affected by other error of law;

(5) Unsupported by substantial evidence admissible under G.S. 150B-29(a), 150B-30, or 150B-31 in view of the entire record as submitted; or

(6) Arbitrary, capricious, or an abuse of discretion.

N.C. Gen. Stat. § 150B-51(b) (2001). The standard of review to be employed by the superior court is dictated by the nature of the error asserted by the party seeking review. *Dillingham v. N.C. Dep't of Human Res.*, 132 N.C. App. 704, 708, 513 S.E.2d 823, 826 (1999). If the petitioner contends the agency's decision was affected by errors of law, N.C.G.S. § 150B-51(1)(2)(3) & (4), *de novo* review is required; if the petitioner contends the agency decision was not supported by the evidence, N.C.G.S. § 150B-51(5), or was arbitrary, capricious, or an abuse of discretion, N.C.G.S. § 150B-51(6), the whole record test is utilized. *Id.* "*De novo* review requires a court to consider the question anew, as if the agency has not addressed it." *Blalock v. N.C. Dep't of Health and Human Servs.*, 143 N.C. App. 470, 475-76, 546 S.E.2d 177, 182 (2001). Under the whole record test, the reviewing court must examine all competent evidence (the 'whole record') in order to determine whether the agency decision is supported by 'substantial evidence.'" *ACT-UP Triangle v. Commission for Health Services*, 345 N.C. 699, 706, 483 S.E.2d 388, 392 (1997) (quoting *Amanini v. N.C. Dept. of Human Resources*, 114 N.C. App. 668, 674, 443 S.E.2d 114, 118 (1994)). In reviewing a superior court order entered upon

review of an administrative agency decision, this Court has a two-fold task: "(1) determine whether the trial court exercised the appropriate scope of review and, if appropriate; (2) decide whether the court did so properly." *Deep River Citizen's Coalition v. N.C. Dep't of Env't & Natural Res.*, 149 N.C. App. 211, 213, 560 S.E.2d 814, 816 (2002). In performing this task, this Court need only consider " 'those grounds for reversal or modification argued by the petitioner before the superior court and properly assigned as error on appeal to this Court.' " *Amanini v. N.C. Dept. of Human Resources*, 114 N.C. App. 668, 675, 443 S.E.2d 114, 118 (1994) (quoting *Professional Food Services Mgmt. v. N.C. Dept. of Admin.*, 109 N.C. App. 265, 268, 426 S.E.2d 447, 449 (1993).

Having reviewed the superior court's order, we conclude it properly exercised *de novo* review in examining the substantive issues raised by respondents' appeal. We now determine whether it did so properly.

[2] As an initial matter, respondents contend the superior court erred in concluding the individual respondents lacked standing to raise the issue of whether the Town approved the location of the County's proposed solid waste landfill within its jurisdiction. The superior court concluded the right of approval belonged exclusively to the Town Board and, since the Town Board had expressly refused to file an administrative appeal of DENR's issuance of Facility Permit 92-22, the individual respondents lacked standing. In contrast, DENR, through the judicially-imposed decision of the ALJ, concluded the individual respondents were "persons aggrieved" under the NCAPA with standing to file a contested case petition.

In its petition for judicial review, Wake County failed to assert as error the agency's conclusion that the individual respondents were "persons aggrieved" under the NCAPA with a right to challenge DENR's issuance of the permit. Nevertheless, "[w]hether one has standing to obtain judicial review of an administrative decision is a question of subject matter jurisdiction[,]" *Carter v. N.C. State Bd. for Professional Engineers*, 86 N.C. App. 308, 313, 357 S.E.2d 705, 708 (1987), which "can be raised at any time, even for the first time on appeal and even by a court *sua sponte.*" *Hedgepeth v. N.C. Div. of Servs. for the Blind*, 142 N.C. App. 338, 341, 543 S.E.2d 169, 171 (2001).

"Under the NCAPA, any 'person aggrieved' within the meaning of the organic statute is entitled to an administrative hearing to

determine the person's rights, duties, or privileges." *Empire Power Co. v. N.C. Dept. of E.H.N.R.*, 337 N.C. 569, 588, 447 S.E.2d 768, 779 (1994) (citing N.C. Gen. Stat. §§ 150B-23(a) (2001)). " 'Person aggrieved' means any person or group of persons of common interest directly or indirectly affected substantially in his or its person, property, or employment by an administrative decision." N.C. Gen. Stat. § 150B-2(6) (2001). Under the predecessor judicial review statute, which did not define the term, the Supreme Court gave it an expansive interpretation:

> The expression "person aggrieved" has no technical meaning. What it means depends on the circumstances involved. It has been variously defined: "Adversely or injuriously affected; damnified, having a grievance, having suffered a loss or injury, or injured; also having cause for complaint. More specifically the word(s) may be employed meaning adversely affected in respect of legal rights, or suffering from an infringement or denial of legal rights."

*In re Assessment of Sales Tax*, 259 N.C. 589, 595, 131 S.E.2d 441, 446 (1963) (quoting 3 C.J.S. *Aggrieved*, at 509 (1973)); *accord Empire Power*, 337 N.C. at 588, 447 S.E.2d at 779; *Orange County v. Dept. of Transportation*, 46 N.C. App. 350, 360, 265 S.E.2d 890, 898-99 (1980). For the following reasons, we conclude the individual respondents are "persons aggrieved" within the meaning of the NCAPA.

Respondents Franks and Schifano *et al.* allege DENR issued Facility Permit 92-22 in violation of statutory and regulatory requirements; specifically, without the approval of the Town and County, without the Town and County holding public hearings, and without the Town and County considering alternative sites and socioeconomic and demographic data.

The individual respondents further allege that, as owners of property located adjacent to the site of the proposed landfill—the construction of which will result in noise, pollution, inalterable landscape changes, and other negative environmental consequences—they will suffer interference with the use and enjoyment of their property and diminution in the value of their property.

In the solid waste management provisions of the North Carolina General Statutes, the General Assembly mandated the Department of Environment and Natural Resources maintain a Division of Waste Management "to promote sanitary processing, treatment, disposal,

and statewide management of solid waste," "[f]or the purpose of promoting and preserving an environment that is conducive to *public health and welfare*, and preventing the creation of nuisances and the depletion of our natural resources." N.C. Gen. Stat. § 130A-291(a) (2001) (emphasis added). The General Assembly further required the Environmental Management Commission to adopt, and the Department of Environment and Natural Resources to enforce, rules to implement a comprehensive statewide solid waste management program. N.C. Gen. Stat. § 130A-294(b).

> The rules shall be consistent with applicable State and federal law; and shall be designed to protect the *public health, safety, and welfare*; preserve the environment; and provide for the greatest possible conservation of cultural and natural resources.

*Id.* (emphasis added). In concluding that a comprehensive statewide solid waste management program was desirable, the General Assembly found that:

> (1) Inefficient and improper methods of managing solid waste create hazards to public health, cause pollution of air and water resources, constitute a waste of natural resources, have an adverse effect on *land values*, and create public nuisances.

N.C. Gen. Stat. § 130A-309.03(a)(1) (2001) (emphasis added).

Clearly, the individual respondents alleged sufficient injury in fact to interests within the zone of those to be protected and regulated by the solid waste management statutes, and rules and regulations promulgated pursuant thereto, the procedural requirements of which they assert the agency violated when it issued Facility Permit 92-22. As adjacent property owners, the individual respondents may be expected to suffer whatever adverse environmental consequences arise from construction of the landfill. The individual respondents may also experience a decrease in the value of their property caused by construction and eventual operation of the landfill. The individual respondents therefore are "persons aggrieved" within the meaning and intent of the solid waste management statutes, with standing to assert that the permit was issued in violation of statutory and regulatory requirements, including the requirement that the Town grant prior approval for location of a landfill in its jurisdiction. *See Empire Power*, 337 N.C. at 589-90, 447 S.E.2d at 780-81 (individual petitioner was "person aggrieved," within the meaning of the NCAPA, by

DENR's issuance of a permit allowing the construction and operation of sixteen combustion turbine electric generating units where the petitioner owned property immediately adjacent to and downwind of the site of the proposed units); *Orange County*, 46 N.C. App. at 360-62, 265 S.E.2d 899 (plaintiffs were all "persons aggrieved" by a decision of the State Board of Transportation on the location of an interstate highway where the individual plaintiffs were property owners within the proposed corridor of the highway, the members of plaintiff non-profit corporation were citizens and taxpayers who lived in or near the proposed highway corridor, and plaintiff county's tax base and planning jurisdiction would be affected; further, the "procedural injury" implicit in the failure of an agency to prepare an environmental impact statement was itself a sufficient "injury in fact" to support standing as an "aggrieved party" under former N.C. Gen. Stat. § 150A-43, as long as such injury was alleged by a plaintiff having *sufficient geographical nexus* to the site of the challenged project that he might be expected to suffer whatever environmental consequences the project might have).

In addition, we conclude the Town, which was added to the case by consent of the parties following Wake County's filing of its petition for judicial review, also qualifies as a "person aggrieved" under the NCAPA because its tax base and planning jurisdiction will be affected by the proposed landfill. *See Orange County*, 46 N.C. App. at 361, 265 S.E.2d at 899; *see also* N.C. Gen. Stat. § 150B-2(7) (2001) (defining "person" under the NCAPA as any "natural person, partnership, corporation, *body politic* and any unincorporated association, organization, or society which may sue or be sued under a common name") (emphasis added)).[3] Therefore, the issue of whether the Town of Holly Springs approved the location of the proposed landfill facility within its jurisdiction, along with all other issues raised by respondents on appeal, was properly before the OAH and the superior court, and is properly presented for review by this Court.

[3] Respondents argue the Town's initial approval, contained in its 1 September 1992 resolution, was only for an "expansion" of the existing Feltonsville Landfill and not the construction of a "new" and separate facility. In the judicially-imposed final agency decision, the ALJ agreed, relying on the distinction between a "lateral expansion" of an "existing municipal solid waste landfill unit," and a "new municipal

---

3. Having concluded that all respondents here are "persons aggrieved" within the meaning of the NCAPA, we do not address whether the individual respondents also have taxpayer standing to contest DENR's issuance of Facility Permit 92-22.

solid waste landfill unit," *see* 15A NCAC 13B.1602 (7), (14), (18) (2002), to support its conclusion that the Town had not granted approval for a "new" landfill facility. However, the superior court concluded the Town gave Wake County approval to site the proposed landfill within the Town's jurisdiction as required by N.C. Gen. Stat. § 130A-294 and 15A NCAC 13B.0504(1)(e) as they existed at the time the Town passed the approval resolution. For the reasons discussed herein, we agree with the superior court's reasoning.

On 1 September 1992, the Town Board passed a resolution granting "prior approval for the issuance of a sanitary landfill permit by the Division of Solid Waste Management to Wake County, said landfill to be *established* on approximately 380 acres," part of which was located in the Town's zoning jurisdiction. At the time, there was no legal distinction between a "new" landfill and a "lateral expansion" of a landfill under the applicable solid waste management statutes and regulations governing landfill permit applications. *See* 15A NCAC 13B.0101 through .0204 (effective 1 April 1982); 15A NCAC 13B.0501 through .0510 (effective 1 April 1982); N.C. Gen. Stat. § 130A-290 through 310.23 (1992).

The distinction between a "lateral expansion" of an existing landfill and a "new" landfill did not appear in the solid waste management regulations until the passage of Title 15A, Subchapter 13B, Section .1600, which became effective 9 October 1993. Under these new regulations, the term " 'lateral expansion' means a horizontal expansion of the waste boundaries of an existing MSWLF [municipal solid waste landfill] unit." 15A NCAC 13B.1602(14). An " 'existing MSWLF unit' means any municipal solid waste landfill unit that is receiving solid waste as of October 9, 1993 and is not a new MSWLF unit." 15A NCAC 13B.1602(7). A " 'new MSWLF unit' means any solid waste landfill unit that has not received waste prior to October 9, 1993." 15A NCAC 13B.1602(18).

Because the Town granted approval for the proposed landfill on 1 September 1992, prior to the effective date of the new solid waste management regulations, we agree with the superior court that the ALJ erred in concluding the Town only approved a "lateral expansion" to the existing Feltonsville Landfill. The term "lateral expansion" was not a legal term of art with a definite meaning at that time. Further, the record on appeal does not indicate Wake County ever used the term "lateral expansion" when referring to the proposed landfill facility.

COUNTY OF WAKE v. N.C. DEP'T OF ENV'T & NATURAL RES.

[155 N.C. App. 225 (2002)]

We also agree with the superior court that the County's references to the proposed landfill as an "expansion" of the Feltonsville Landfill, which became inaccurate in 1993 when it was mandated that the Feltonsville Landfill be closed by 1 January 1998, were simply a method of identifying the location of the proposed landfill adjacent to the Feltonsville Landfill. The term "expansion" was not a legal term of art with any particular legal significance under the solid waste management statutes and regulations applicable at the time the Town granted its approval in September 1992.

The record shows the County proceeded with its landfill plans in accordance with the applicable regulations in existence at the time. The County sought and was granted local government approval from the Town as required by N.C. Gen. Stat. § 130A-294(a)(4), as it existed at the time, and 15A NCAC 13B.0504(1)(e). The County then filed its site plan application with DENR on 4 December 1992, beginning the permitting process. *See* 15A NCAC 13B.0202 (stating permit applications must contain both site and construction plans); 15A NCAC 13B.0504 (enumerating the requirements for a site plan application for a proposed sanitary landfill before the requirements for a construction plan application).

In addition, there is no evidence in the record that the County misled or deceived the Town in any way in securing the Town's approval. In fact, the plans for the proposed landfill contained in the construction permit application approved by DENR do not differ in any material respect from the plans presented to and approved by the Town Board on 1 September 1992. In short, the landfill facility approved by the Town in September 1992 is the same landfill facility permitted to be constructed under Facility Permit 92-22. Accordingly, the superior court did not err in concluding the Town gave approval for the proposed landfill facility at issue here.

[4] Respondents next contend that, even if the Town granted approval for a "new" landfill facility on 1 September 1992, the Town at all times possessed the inherent power to withdraw its approval pursuant to its discretionary governmental authority. Thus, the Town maintains its withdrawal of approval for the landfill on 19 May 1998 was valid and effective.

However, subsequent to 1 September 1992, the Town Board took several actions which explicitly ratified its previous approval of the County's proposed landfill. We conclude that these multiple acts of ratification equitably estopped the Town from withdrawing its

approval for the proposed landfill following DENR's acceptance of the County's site plan application on 14 March 1995.

As a general rule, the doctrine of equitable estoppel is not applicable to municipal corporations in matters pertaining to governmental functions. 12 McQuillan *Municipal Corporations* § 34.85 (3d ed. 1995). However, courts in many jurisdictions have applied "the doctrine in exceptional cases, where, upon all the circumstances of the case, right and justice require it." *Id.* at 251. In *Land-of-Sky Regional Council v. Co. of Henderson*, 78 N.C. App. 85, 336 S.E.2d 653 (1985), this Court addressed the application of the doctrine of equitable estoppel to a municipal corporation as follows:

> We recognize that counties [and municipalities] are not subject to an estoppel to the same extent as a private individual or a private corporation. *See Henderson v. Gill, Comr. of Revenue*, 229 N.C. 313, 49 S.E.2d 754 (1948). Otherwise a county [or municipality] could be estopped from exercising a governmental right. *Id.* However, a governmental entity may be estopped if it is necessary to prevent loss to another and the estoppel will not impair the exercise of governmental powers. *Washington v. McLawhorn*, 237 N.C. 449, 454, 75 S.E.2d 402, 406 (1953).
>
> Estoppel is a means whereby a party may be prevented from asserting a legal defense contrary to or inconsistent with previous conduct. *Godley v. County of Pitt*, 306 N.C. 357, 360, 293 S.E.2d 167, 169 (1982). In *Godley*, the court determined that detrimental reliance need not be established to invoke the remedial doctrine of quasi estoppel. *Id.* at 361, 293 S.E.2d at 170. Quasi estoppel "is directly grounded upon a party's acquiescence or acceptance of payment or benefits, by virtue of which that party is thereafter prevented from maintaining a position inconsistent with those acts." *Id.* One who has the right to accept or reject the benefits flowing from a transaction or instrument and does not do so but instead accepts these benefits has ratified that transaction. *Redevelopment Comm. of City of Greenville v. Hannaford*, 29 N.C. App. 1, 4, 222, S.E.2d 752, 754 (1976)

*Id.* at 91-92, 336 S.E.2d at 657.

Applying the equitable principles stated in *Land-of-Sky*, we conclude the Town repeatedly ratified its initial approval of the County's proposed landfill. On 15 December 1994, the Town agreed to provide Wake County 50,000 gallons of wastewater treatment capacity in the Town's treatment plant in exchange for forgiveness of $298,291.00 in

debt and payment of $228,800.00 for construction of a wastewater collection system and pumping station to service the landfill site. This agreement reiterated the Town's approval of the construction, as well as operation, of the County's proposed landfill.

On 17 April 1995, the agreement between the Town and Wake County was amended to require Wake County to forthwith pay the Town $228,800.00 for construction of the wastewater collection system and pumping station instead of waiting until Wake County received a permit to construct. Wake County subsequently paid the Town. In sum, counting debt forgiveness and payment, the Town received a financial benefit of approximately $527,000.00 as a result of its approval of the proposed landfill site.

Finally, on 20 May 1997, over four-and-a-half years after giving its approval for the new landfill, the Town approved Wake County's Ten Year Solid Waste Management Plan which stated that all municipal solid waste generated in Wake County between 2003 and 2023 would be disposed of at the proposed new facility.

Wake County relied upon the Town's ratification of its 1 September 1992 approval of the proposed landfill. Not only did Wake County provide the Town a large financial benefit following its grant of approval, but Wake County proceeded with the steps required to make the proposed landfill a reality. Wake County filed and received approval of a site plan application and a permit to construct. These steps required large financial investments on Wake County's part. To allow the Town to withdraw its approval and take a position inconsistent with its actions running over a period of nearly six years would be inequitable under the circumstances. It would create needless instability in the permitting process for the siting and construction of solid waste management facilities within this State, a process which is necessarily time consuming due to the significant public interest and highly-technical complexities involved, by allowing local governments to grant prior approval for a landfill site then withdraw that approval prior to the completion of the permitting process. The superior court refused to countenance such a result, as do we. We conclude, under the circumstances here, that the Town was equitably estopped from withdrawing its prior approval for the County's proposed landfill facility.[4]

---

4. As a result of this conclusion, we do not consider the vested rights argument presented by DENR and the North Carolina Association of County Commissioners in their *amicus* briefs. We also do not consider Wake County's argument that the Town contractually waived its right to withdraw its approval by entering into the Interlocal Agreement.

**[5]** Respondents next contend the superior court erred in concluding Wake County was not required to obtain a franchise from the Town for operation of the landfill prior to receiving Facility Permit 92-22. Respondents argue a franchise was required under both Chapter 160A, Article 16 of the General Statutes, entitled "Public Enterprises," and N.C. Gen. Stat. § 130A-294(b1)(3). It is undisputed that Wake County did not obtain a franchise from the Town. Thus, respondents maintain the Town's approval was a mere license which was revocable at any time. Wake County counters by arguing that the statutes relied upon by respondents did not require the County to obtain a franchise prior to starting construction of the landfill pursuant to Facility Permit 92-22.

We first address respondents' argument as to N.C.G.S. § 130A-294(b1)(3), which reads in pertinent part:

(3) An applicant for a new permit, the renewal of a permit, or a substantial amendment to a permit for a sanitary landfill shall obtain, prior to applying for a permit, a franchise for the operation of the sanitary landfill from each local government having jurisdiction over any part of the land on which the sanitary landfill and its appurtenances are located or to be located. A local government shall adopt a franchise ordinance under G.S. 153A-136 or G.S. 160A-319 prior to the submittal by an applicant of an application for a new permit, the renewal of a permit, or a substantial amendment to a permit for a sanitary landfill. A franchise granted for a sanitary landfill shall include:

a. A statement of the population to be served, including a description of the geographic area.

b. A description of the volume and characteristics of the waste stream.

c. A projection on the useful life of the landfill.

N.C. Gen. Stat. § 130A-294(b1)(3) (2001).

If Wake County was to begin today the permitting process for a new landfill to be located in the Town, N.C.G.S. § 130A-294(b1)(3) would require it to secure a franchise from the Town to operate the new landfill facility prior to applying for a permit from DENR. However, N.C.G.S. § 130A-294 (b1)(3) was added to the General Statutes by Session Laws 1993 (Reg. Sess. 1994), c. 722, and became effective on 7 July 1994. Section 3 of this Act states that it is "effec-

tive upon ratification and applies to applications submitted on or after the effective date." Here, Wake County began the permitting process for the proposed landfill by submitting its site plan application on 4 December 1992, prior to the effective date of N.C.G.S. § 130A-294(b1)(3). Accordingly, Wake County was not required to secure a franchise for operation of the landfill pursuant to N.C.G.S. § 130A-294(b1)(3).

Respondents also contend Wake County was required to obtain a franchise from the Town pursuant to the Public Enterprise Statutes set forth in Chapter 160A, Article 16. N.C. Gen. Stat. § 160A-319, entitled "Utility Franchises," reads in pertinent part:

> (a) A city *shall have authority* to grant upon reasonable terms franchises for the operation within the city of any of the enterprises listed in G.S. 160A-311 and for the operation of telephone systems . . . Except as otherwise provided by law, when a city operates an enterprise, or upon granting a franchise, a city *may* by ordinance make it unlawful to operate an enterprise without a franchise.

N.C. Gen. Stat. § 160A-319(a) (2001) (emphasis added). Included among the list of "public enterprises" is "[s]olid waste collection and disposal systems and facilities." N.C. Gen. Stat. § 160A-311(6) (2001). Pursuant to N.C.G.S. § 160A-76, any such ordinance granting a "public enterprise" franchise must be passed at two regular meetings of the city or town council. N.C. Gen. Stat. § 160A-76(a) ("No ordinance making a grant, renewal, extension, or amendment of any franchise shall be finally adopted until it has been passed at two regular meetings of the council, and no such grant, renewal, extension, or amendment shall be made otherwise than by ordinance.").

Respondents contend that these statutes, when read *in pari materia*, required Wake County to obtain a franchise from the Town of Holly Springs prior to receiving Facility Permit 92-22.

We first note that the language used in the statutes is not mandatory in nature. N.C.G.S. § 160A-319 states that cities and towns shall have the *authority* to grant franchises for public enterprises and, when they *choose* to do so, they *may* pass an ordinance making it unlawful to operate a public enterprise within the city or town without a franchise. The statute does not by its language require the grant of a franchise from a city or town prior to the operation of a public utility not owned and operated by the city or town.

However, case law interpreting Chapter 160A, and its predecessor, indicates that a franchise is mandatory for the operation of a "public enterprise." *See Madison Cablevision v. City of Morganton*, 325 N.C. 634, 654, 386 S.E.2d 200, 212 (1989) ("A city needs no grant from itself to own and operate public enterprises, including operating a CATV [cable television] system; it does so in its own right pursuant to the authority granted to it by the legislature under General Statutes chapter 160A, article 16, part 1. It needs no franchise or other grant of authority from itself as do non-municipal suppliers of the same enterprise."); *Shaw v. Asheville*, 269 N.C. 90, 152 S.E.2d 139 (1967); *Power Co. v. Membership Co.*, 253 N.C. 596, 604, 117 S.E.2d 812, 817 (1961) ("Every town has by statute, G.S. 160-2(6) [now N.C.G.S. § 160A-311], the power to grant franchises to public utilities, that is, the right to engage within the corporate boundaries in business of a public nature. Businesses requiring sovereign permission to operate are multitudinous: transportation of goods and persons by railroad or by motor carrier, transmission of telegrams, transmission and distribution of electric power, water and sewerage systems, telephone systems . . . and street railways are but illustrative of the many kinds of businesses which may require sovereign approval."). Based on this case law, we are constrained to conclude that a city or town is required to pass an ordinance granting a franchise any time a third party, be it a private individual or corporation, another municipality, or a county, seeks to operate a public utility such as a solid waste disposal facility.

Nonetheless, we conclude the Town of Holly Springs is equitably estopped from arguing that Wake County has failed to receive a franchise from the Town for operation of the proposed landfill. When the Town granted its approval of the County's proposed landfill, on 1 September 1992, the Town had no ordinance requiring a franchise for the operation of a public utility within its jurisdiction. Over the ensuing period of nearly six years, the Town took several steps to ratify this approval, including: (1) entering into an Interlocal Agreement, and subsequent amendment thereto, reiterating its approval of the construction and operation of the landfill and receiving a significant financial benefit, and (2) approving Wake County's Ten Year Solid Waste Management Plan calling for the disposal of all solid waste generated in Wake County between 2003 and 2023 at the proposed landfill.

Wake County relied on the Town's conduct in proceeding with its plans to construct the landfill. In so doing, Wake County made large

financial investments. To allow the Town to now, or in the future, pass an ordinance requiring a franchise for the operation of a public utility within its jurisdiction, and subsequently attempt to prevent Wake County from operating the proposed landfill on the grounds that a franchise has not been secured, would be grossly inequitable under the circumstances of the instant case. Accordingly, we hold the Town is equitably estopped from contending that a franchise is currently, or in the future, required for operation of the proposed landfill.

**[6]** Respondents next contend the superior court erred in concluding 15A NCAC 13B.1618 did not apply to Wake County's permit to construct the landfill. Respondents further maintain the County failed to adhere to the public notice and public hearing requirements set forth in 15A NCAC 13B.1618(c)(5)(A)(i-iv).

While respondents correctly contend that 15A NCAC 13B.1618(c)(5)(A)(i-iv) require a public hearing with sufficient public notice prior to the granting of local government approval for a site plan application for a new landfill, these provisions do not apply to the permitting process in the instant case due to the grandfather provision found in 15A NCAC 13B.1618(e), which states:

> (e) New facility applications in transition. Site plan applications for a new facility submitted in accordance with Rule .0504 (1) of this Section after January 15, 1992 and prior to April 9, 1993 and approved by the Division consistent with Subparagraph (a)(1) of this Rule are not subject to the requirements of this Rule.

15A NCAC 13B.1618(e) (2002).

Here, the County filed its site plan application with DENR on 4 December 1992. The site plan application was submitted in accordance with the requirements of Rule .0504(1), including the approval of the Town Board. The County's site plan application was subsequently approved, on 14 March 1995, by the Division of Solid Waste Management and the County was authorized to prepare an application for a permit to construct. *See* 15A NCAC 13B.1618(a)(1). Accordingly, the County's site plan application was not subject to 15A NCAC 13B.1618(c)(5)(A).

**[7]** Respondents next contend the superior court erred in concluding N.C. Gen. Stat. § 153A-136(c) was inapplicable to Wake County's selection of the site for the proposed new landfill. We disagree.

N.C.G.S. § 153A-136(c), effective 22 July 1992, sets forth require-ments that must be satisfied by a county prior to the selection or approval of certain landfill sites.

## § 153A-136 Regulation of solid wastes.

. . .

(c) The board of commissioners of a county shall consider alter-native sites and socioeconomic and demographic data and shall hold a public hearing prior to selecting or approving a site for a new sanitary landfill that receives residential solid waste that is located within one mile of an existing sanitary landfill within the State. The distance between an existing and a proposed site shall be determined by measurement between the closest points on the outer boundary of each site. The definitions set out in G.S. 130A-290 apply to this subsection. As used in this subsection:

(1) "Approving a site" refers to prior approval of a site under G.S. 130A-294(a)(4).

(2) "Existing sanitary landfill" means a sanitary landfill that is in operation or that has been in operation within the five-year period immediately prior to the date on which an application for a permit is submitted.

(3) "New sanitary landfill" means a sanitary landfill that includes areas not within the legal description of an existing sanitary land-fill as set out in the permit for the existing sanitary landfill.

(4) "Socioeconomic and demographic data" means the most recent socioeconomic and demographic date compiled by the United States Bureau of the Census and any additional socioeco-nomic and demographic data submitted at the public hearing.

. . . .

N.C. Gen. Stat. § 153A-136(c) (2001).

Here, it is undisputed that the proposed landfill facility con-stitutes a "new sanitary landfill" under N.C.G.S. § 153A-136(c), since the area of the proposed landfill is not within the legal description of an existing sanitary landfill. It is likewise undisputed that the pro-posed landfill is located within one mile of the Feltonsville Landfill, which was in operation when the County's site plan application was submitted. It is further uncontested that Wake County did not meet the requirements of N.C.G.S. § 153A-136(c) in selecting or approv-

ing the site for the proposed landfill. Wake County argues that it is excused from compliance with N.C.G.S. § 153A-136(c) by the exemption enacted contemporaneously therewith, which provides in pertinent part:

G.S. 153A-136(c) . . . shall not apply to the selection **or** approval of a site for a new sanitary landfill if, prior to the effective date of this act [22 July 1992]:

(1) The site was selected **or** approved by the board of commissioners of a county or the governing board of a city;

(2) A public hearing on the selection **or** approval of the site has been held;

(3) A long-term contract was approved by the Department of Environment, Health, and Natural Resources [now the Department of Environment and Natural Resources] under Part 4 of Article 15 of Chapter 153A of the General Statutes; **or**

(4) An application for a permit for a sanitary landfill to be located on the site has been submitted to the Department of Environment, Health and Natural Resources [now the Department of Environment and Natural Resources].

Session Laws 1991 (Reg. Sess., 1992), c. 1013, s. 9 (emphasis added).

Wake County contends the actions of the County Board constituted selection or approval of the proposed landfill site prior to 22 July 1992, the effective date of N.C.G.S. § 153A-136(c). Respondents however contend Wake County had not selected or approved a site for a "new" landfill prior to 22 July 1992. According to respondents, all Wake County had done at that time was authorize the "lateral expansion" of the existing Feltonsville Landfill. Since a "new" landfill had not been authorized prior to 22 July 1992, respondents insist N.C.G.S. § 153A-136(c) applies to the selection of the proposed landfill site. Respondents further contend the County could not have selected or approved the proposed landfill site prior to 22 July 1992, whether it be considered a "new" landfill or a "lateral expansion," because the Town's approval of the site was a condition precedent to the County's approval and the Town did not grant its approval until 1 September 1992, after the effective date of N.C.G.S. § 153A-136(c).

As earlier noted, the distinction between a "new" municipal solid waste landfill and a "lateral expansion" of an existing landfill did not appear in the solid waste management rules and regulations until 9

October 1993, after both the Town and the County had clearly selected and approved the proposed landfill site. Further, the record shows that the County's plans for the landfill did not change in any material respect following the Town's approval on 1 September 1992. Because the County initially referred to its proposed plans as an "expansion" of the Feltonsville Landfill does not change the fact that the plans approved by the County and Town were at all times for the construction of a "new sanitary landfill" facility, as defined under N.C.G.S. § 153A-136(c). Accordingly, we must determine whether the County selected or approved the site prior to the effective date of N.C.G.S. 153A-136(c).

In *Grassy Creek Neighborhood Alliance, Inc. v. City of Winston-Salem*, 142 N.C. App. 290, 542 S.E.2d 296 (2001), this Court faced a similar question. In *Grassy Creek*, the plaintiffs argued that the City of Winston-Salem Board of Alderman had not selected or approved the site for a landfill prior to 22 July 1992, the effective date of N.C.G.S. § 160A-325, which sets forth the same requirements for cities and towns as does N.C.G.S. § 153A-136(c) for counties.

The Court noted that, prior to 22 July 1992, the City had entered into an interlocal agreement with Forsyth County creating a Utility Commission with responsibility over, *inter alia*, solid waste management and disposal. On 12 August 1991, the Utility Commission approved a resolution to proceed with the landfill. The resolution created access restrictions and buffer requirements for the landfill site and identified the site by tax lots and block numbers. The resolution also stated the approximate price of the property for the landfill site and resolved that the City undertake to acquire the property.

On 9 September 1991, the Finance Committee of the Board of Alderman approved a resolution entitled "RESOLUTION OF THE CITY OF WINSTON-SALEM, NORTH CAROLINA APPROVING THE LEASE AGREEMENT WITH NORTH CAROLINA MUNICIPAL LEASING CORPORATION AND RELATED MATTERS." Under the terms of the lease, North Carolina Municipal Leasing Corporation would purchase the property for the landfill and lease it to the City. The Finance Committee attached a "Board of Alderman-Action Request Form" to the resolution stating that the lease was, in part, for the acquisition of "land for future solid waste disposal."

On 16 September 1991, the Finance Committee resolution and the Action-Request Form were brought before the Board of Alderman. The Board approved the following resolution:

the Mayor, the City Manager, the City Secretary, and the Director of Finance of the City are hereby authorized, empowered and directed to do any and all other acts and to execute any and all other documents, which they in their discretion, deem necessary and appropriate in order to consummate the transactions contemplated by (I) this Resolution, (ii) the Lease, and (iii) the documents presented to this meeting . . .

This Court concluded the actions of the Board of Alderman—approving the lease agreement for the property that had previously been identified as "land for solid waste disposal"—were sufficient to constitute a selection or approval of the landfill expansion site on 16 September 1991, prior to the effective date of N.C.G.S. § 160A-325.

Here, the County Board, on 29 October 1990, authorized the purchase of the 162.37-acre tract of land for the landfill. On 5 August 1991, the County Board directed staff to pursue acquisition of additional property for the landfill. Finally, on 6 April 1992, the County Board authorized the purchase of the four additional tracts of land to be used for the landfill.

We hold these actions of the County Board to be sufficient to constitute selection of the landfill site as of 6 April 1992, prior to the effective date of N.C.G.S. § 153A-136(c). Accordingly, the exemption found in Session Laws 1991 (Reg. Sess., 1992), c. 1013, s. 9 applies and the County was not required to consider alternative sites and socioeconomic and demographic data, or to hold a public hearing prior to selecting the site.

Respondents correctly point out that the Town, under N.C. Gen. Stat. § 160A-325(a), has a separate and independent duty to consider alternative sites and socioeconomic and demographic data prior to granting its approval of the location of a "new sanitary landfill." Because the Town's approval was not granted until 1 September 1992, after the effective date of N.C.G.S. § 160A-325, and the Town did not meet the requirements of the statute, respondents maintain Facility Permit 92-22 was issued in violation of N.C.G.S. § 160A-325 and must be set aside.

However, consideration of the requirements found in N.C.G.S. §§ 153A-136(c) and 160A-325(a) are not part of the permitting process for a solid waste management landfill. DENR is authorized to issue permits "governing the establishment and operation of solid waste management facilities." N.C. Gen. Stat. § 130A-294(4)a (2001).

DENR's authority to promulgate rules and regulations and to develop a permitting system for landfills is therefore derived from N.C.G.S. § 130A-294(a)(4)a. The administrative rules promulgated pursuant to N.C.G.S. § 130A-294 specify detail requirements that applicants must meet and state specifically that applications for permits shall be reviewed "to assure that all provisions of these Rules, the Solid Waste Management Act [N.C. Gen. Stat. § 130A, Article 9], and the Federal Act [the Resource Conservation and Recovery Act of 1976], will be met." 15A NCAC 13B.0203 (2002). Neither the Rules, the Solid Waste Management Act, nor the Federal Act incorporates N.C.G.S. § 153A-136(c), or N.C.G.S. § 160A-325(a), as a requirement which must be met by landfill permit applicants.

Generally, an administrative agency may exercise its authority only as specifically delegated by the legislature. North Carolina has embraced this principle in N.C. Gen. Stat. § 150B-19 (2001), which reads in pertinent part:

> An agency may not adopt a rule that does one or more of the following:
>
> (1) Implements or interprets a law unless that law or another law specifically authorizes the agency to do so.

Because neither N.C.G.S. § 160A-325(a) nor any other statute specifically authorizes DENR to implement or interpret Section 160A-325(a), it is not part of DENR's regulatory permitting scheme for solid waste management landfills, and assuming, *arguendo*, the Town was required to adhere to its requirements, failure to do so does not require withdrawal of Facility Permit 92-22.

Finally, even if a municipality's failure to comply with N.C.G.S. § 160A-325(a) could warrant withdrawal of a landfill permit issued by DENR, we would still conclude, based on the facts of the instant case, that here the Town of Holly Springs and the individual respondents are equitably estopped from raising such a failure in contesting Facility Permit 92-22.

For the reasons discussed herein, we agree with the able and learned superior court judge, and affirm his reissuance of Facility Permit 92-22 to Wake County.

Affirmed.

Judge McGEE concurs.

Judge WALKER concurs in a separate opinion.

WALKER, Judge, concurring.

I concur in this well-reasoned opinion and I further agree with the following conclusion of the trial court:

24. Additionally this Court concludes as a matter of law that the Interlocal Agreements between Wake County and the Town of Holly Springs entered into on December 12, 1994, and April 17, 1995, are valid, enforceable contracts between the parties. In those agreements the Town specifically approved Wake County's "construction and operation" of the MSW landfill within the Town's jurisdiction. By those agreements the Town contractually released any right it might have had to withdraw its approval for Wake County to locate the MSW landfill within the Town's jurisdiction. Because the Town had contractually surrendered any such right of withdrawal it might have had, the Decision's conclusion that DENR was required not to issue the MSW landfill construction permit to Wake County because of the Town's withdrawal of approval is erroneous as a matter of law.